IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA    :
    :
    v.    :  CRIMINAL ACTION NO.
    :  1:10-CR-007-RWS-CCH
MAIDMOISELLE LEWIS, ET AL.    :
    :

## ORDER FOR SERVICE OF REPORT AND RECOMMENDATION

Attached is the Report and Recommendation of the United States Magistrate Judge in this action in accordance with 28 U.S.C. § 636(b)(1) and this Court's Criminal Local Rules 12.1(E) and 58.1(A)(3).

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of service of this Order.  Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court.  If no objections are filed, the Report and Recommendation may be adopted as the opinion and order of the District Court and

any appellate review of factual findings will be limited to a plain error review.  United States v. Slay, 714 F.2d 1093 (11th Cir. 1983).

Pursuant to 18 U.S.C. 3161(h)(1)(D), the above referenced fourteen (14) days allowed for filing objections are **EXCLUDED** from the computation of time under the Speedy Trial Act.  At the end of such fourteen-day period, if there are no objections,  the Clerk is **DIRECTED** to submit this Report and Recommendation to the District Judge.  If there are objections, the other party or parties shall have fourteen (14) days from the filing of those objections to respond, and that fourteen-day period shall also be **EXCLUDED** from the computation of time under the Speedy Trial Act. Thereafter, the Report and Recommendation along with any objections and responses shall be submitted to the District Judge.

After such submission of this Report and Recommendation, whether or not objected to, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time under the Speedy Trial Act the time, up to thirty (30) days, that this Report and Recommendation is under advisement before the District Court.  Henderson v. United States, 476 U.S. 321, 331 (1986) (the Speedy Trial Act "exclude[s] all time that is consumed in placing the trial court in a position to dispose of a motion.); United States

2

v. Mers, 701 F. 2d 1321, 1337 (11th Cir. 1983) ("[T]he magistrate and the district court have thirty days each during which to take pretrial motions under advisement.").

IT IS SO ORDERED this 16th day of June, 2010.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. |
| | : | 1:10-CR-007-RWS-CCH |
| MAIDMOISELLE LEWIS, ET AL. | : | |
| | : | |

## **REPORT AND RECOMMENDATION**

Defendant Maidmoiselle Lewis is charged in the indictment with four counts of possession of a firearm by an unlawful alien, in violation of Title 18, United States Code, Section 922(g)(5).  Defendant Noel Newton Robinson is charged with three counts of possession of a firearm by an unlawful alien, and also with being found within the United States without permission after having previously been deported and removed from the United States, in violation of Title 8, United States Code, Sections 1326(a) and (b)(2), and with being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1).  See Indictment [8].

Presently before the Court is Defendant Lewis' First Motion to Suppress Evidence and Statements [23] [26] (hereinafter "the Motion").  Defendant Robinson moved to adopt the Motion [24] and Robinson's request was granted [25].

On February 24, 2010, a hearing was held on the Motion.  After receipt of the transcript Defendant Lewis filed a brief in support of the Motion [35] and Defendant Robinson moved to adopt Defendant Lewis' brief [39].  Robinson's motion to adopt [39] is **GRANTED**.[1]

After continuances granted to Defendant Lewis and the Government, all briefing was finally completed on May 6, 2010 and the case was submitted to the undersigned at that time.  Having heard the evidence and having reviewed the transcripts of the evidentiary hearings and the briefs of the parties, the undersigned **RECOMMENDS** that the Motion [23] [26] be **DENIED**.

## FINDINGS OF FACT

January 23, 2008, Events

1.      On January 23, 2008, in the early afternoon, two Fulton County Police Department Officers responded to a call that someone was discharging a firearm at 4755 Campbellton-Fairburn Road, in Fairburn, Georgia.  See Transcript of February 24, 2010 Hearing ("T.") at 32-33.

_____

[1]Robinson did not make any statements.  See Motion to Adopt [39] at 2.  As a result, he is only adopting that portion of the Motion which seeks to suppress evidence.

2.      The uniformed officers, Corporal Tommy Grier of the Fulton County Police Department's Special Operations Unit, and his partner, met with two individuals at the scene, a black male and a black female.  The female identified herself as Alexandria White, but it was later determined that her name was Maidmoiselle Lewis.  T. at 33-34, 47.

3.      Outside the home, the officers engaged Lewis and the male, who were unarmed, in conversation.  T. at 33.  Corporal Grier observed that the two individuals had been drinking and were visibly intoxicated.  T. at 66-67.

4.      Corporal Grier asked Lewis if she had been shooting a firearm.  She responded in the affirmative and volunteered that the firearm was a pistol inside the home. T. at 34.

5.      Corporal Grier then asked for her consent to retrieve the firearm from the house.  She consented, and led him inside to a bedroom closet in the back of the house.  T. at 34.  Corporal Grier seized the pistol and then escorted Lewis back outside.  T. at 35.

6.      Outside, Corporal Grier asked Lewis, "Where were you shooting the gun at?" T. at 35.  Lewis showed Grier a tree that she had shot.  T. at 36.  Grier noticed

3

fresh bullet holes in the tree.  T. at 36.  Grier told Lewis she was under arrest for reckless conduct because he concluded that the bullets fired from the firearm were shot across her neighbor's property.  T. at 37.

7.     Grier issued Lewis a ticket and instructed her to appear in court on a specific date.  T.at 36.  He did not handcuff her or take her into custody.  T. at 38.

8.     At the end of the encounter, Lewis allegedly stated that she was tired of drinking her problems away and that she was depressed.  T. at 69, 72.  As a result, Corporal Grier called an ambulance.  T. at 69, 71.

9.     Corporal Grier testified that while Lewis slurred her words and was unsteady on her feet, he did not have to repeat his words or instructions to her.  T. at 76.

November 17, 2009, Events

10.    On November 17, 2009, Fulton County patrol officers responded to 4755 Campbellton-Fairburn Road after receiving a call about a fight, possibly armed, between neighbors.  T. at 39.  Corporal Grier was sent to the location since he had dealt with individuals at that address two years previously.  T. at 39.

4

11.   When Grier arrived at the scene, he was directed to a witness across the street. The witness, Mr. Stevens, told Grier that a female across the street attempted to pay him with marijuana after he worked in her yard.  T. at 40.  After he rejected her offer, the female told Stevens to return in one hour for payment from her boyfriend.  T. at 40.  When Stevens returned he was met by a man, "Mr. B.," who pushed Stevens down some stairs and pointed a handgun at him, telling Stevens to get off the property.  T. at 40.  After speaking with Mr. Stevens, the officers went across the street to investigate the assault.  T. at 40.

12.   Corporal Grier and the other officers went across the street to Lewis' residence. They found the front door open, but did not see anyone.  T. at 41.  Grier knocked on the door but there was no response.  T. at 41.

13.   An officer who had gone to the side of the residence observed a man, later identified as Defendant Robinson, "poke his head out" of a shed on the rear of the property.  T. at 41.  Robinson was ordered to approach the officers, which he did.  T. at 41.  Robinson was then handcuffed and patted down.  T. at 42. After the pat down, Grier removed the handcuffs from Robinson.  T. at 42.

14.     While the officers were talking with Robinson, Lewis exited through the front door, accompanied by her young son.  T. at 42.

15.     Grier explained that the officers had responded to investigate a complaint that Robinson had pointed a gun at an individual and that marijuana had been seen on a table in the living room.  He then asked Lewis' consent to search the living room.  T. at 45.

16.     Lewis asked Grier if he had a warrant and he stated that he did not.  T. at 45. Gier then stated that he just wanted "to clear this up and check your living room.  That's all I need to see."  T. at 45.  Lewis responded, "Okay, fine," and led Grier into the living room.  T. at 45.

17.     Grier searched the living room and did not find any marijuana or guns in the living room.  T. at 46.

18.     While in the living room, Grier observed through a door opening into the dining room a cardboard box marked as evidence.  T. at 46.  Grier recognized the box as the type used for putting guns into evidence.  T. at 46.  It was about twenty (20) feet away from Grier.  T. at 46.  Grier did not retrieve the box, but noted to himself that it might contain a gun.  T. at 47.

19.   Lieutenant Hayes then arrived at the scene and asked "Alexandria White" her name. T. at 47.  Defendant Lewis admitted her name was Maidmoiselle Lewis. T. at 47.

20.   Hayes then asked Lewis if the officers could sit in the living room, or her dining room table, to "get this thing worked out."  T. at 48-49.  Lewis responded, "sure," and Lewis, Grier, and Hayes moved to the dining room table where Lewis was questioned.  T. at 49.

21.   In the dining room, Grier noticed "ammunition boxes" and "more ammunition stacked up" beside the firearm evidence box.  T. at 49.  The box and ammunition were in plain view to Grier.  T. at 49.

22.   Grier then went to his patrol vehicle and requested G.C.I.C.[2] computer checks on Defendants.  T. at 48.  The response indicated that Lewis was wanted on three warrants from separate agencies.  T. at 48.  It was later discovered that Robinson was also wanted.  T. 51.

---

[2]Georgia Crime Information Center.

23.    Grier returned and told Lewis that she had to wait twenty or thirty minutes for the warrants to be confirmed.  T. at 50.  After the warrants were confirmed, Lewis was handcuffed.  T. at 50.

24.    Grier then left the residence to secure a search warrant for the premises.  T. at 53.  After securing the warrant, Grier returned and officers began the search, which yielded several pistols and a small amount of marijuana.  T. at 55.

25.    After dark, possibly around 7:30 or 8:00, Agent Arrugueta of the ATF arrived in response to a call from an officer at the scene.  T. at 14.  Agent Arrugueta spoke with Defendant Robinson who was seated on a couch holding Lewis' child.  T. at 18.  Lewis' father was also present.  T. at 18.  Agent Arrugueta told Robinson that he was not under arrest and that he wanted to speak with the father and Defendant Lewis "voluntarily."  T. at 19.

26.    Agent Arrugueta first obtained basic identification information from the father, and then Defendant Robinson, inquiring about Robinson's nationality and immigration status.  T. at 20.  Arrugueta was armed with a weapon in his holster.  T. at 21.  Police officers were standing close by.  T. at 18.

8

27.    Agent Arrugueta then spoke with Lewis and asked her to go with him and Thor

        Witmore, an agent from Immigration and Customs Enforcement (ICE), to a

        bedroom "a little bit more secluded."   T. at 23.   In the bedroom Agent

        Arrugueta asked Defendant Lewis "broad-based information related to firearms

        and/or drug trafficking."  T. at 25.

28.    Later, back in the dining room, as the encounter was wrapping up, Lieutenant

        Hayes commented to Agent Arrugueta that .45 caliber ammunition had been

        found, but no .45 caliber pistol.  T. at 25.  Defendant Lewis then commented

        that her dad had that gun and had taken it to be repaired for her.  T. at 25-26.

## DISCUSSION

A.       January 23, 2008

Defendant Lewis argues that on January 23, 2008, she was illegally questioned
in violation of her rights under the Fifth Amendment, and her home was illegally
searched in violation of the Fourth Amendment, which prohibits unreasonable
searches and seizures by the government.  As a result, Defendant argues that her
statements from that day as well as any evidence seized from her home should be
suppressed.

9

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court ruled that because custodial interrogation of arrested suspects in criminal cases is inherently coercive, statements made in response to such interrogation should be treated as presumptively coerced in violation of a defendant's Fifth Amendment rights. Thus, the Court held that a defendant's incriminating statements are not admissible as evidence against the defendant unless the defendant was advised before interrogation of his right to remain silent and his right to the presence of an attorney, including an appointed attorney if he was unable to afford one, and advised of the fact that anything he said could be used against him. Miranda, 384 U.S. at 478-79.

Miranda warnings are not required for all police encounters with citizens, however, but only when police interrogate a suspect who is in custody. Rhode Island v. Innis, 446 U.S. 291, 300 (1980). A suspect is said to be in custody only when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492, 495(1977)); see also United States v. Muegge, 225 F.3d 1267, 1269-70 (11th Cir. 2000). Similarly, not all police questioning rises to the level of interrogation. "The term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other

than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Innis</u>, 446 U.S. at 301, 100 S. Ct. at 1689-90 (footnotes omitted).

To determine whether the government has violated a defendant's Fifth Amendment right against self-incrimination, courts focus on whether the defendant was interrogated in police custody at the time the statements were made. In <u>Thompson v. Keohane</u>, 516 U.S. 99 (1995), the Supreme Court held that courts must look at the totality of the circumstances surrounding the interrogation to evaluate whether an individual was in custody for <u>Miranda</u> purposes. "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." <u>Thompson</u>, 516 U.S. at 112 (footnote omitted). As the Eleventh Circuit has explained:

> In order for a court to conclude that a suspect is in custody, it must be evident that, under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as 'that degree associated with a formal arrest' to such extant that he would not feel free to leave. Under the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person.

11

Muegge, 225 F.3d at 1270 (quoting United States v. Phillips, 812 F.2d 1355, 1360 (11th Cir. 1987) and United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996)) (citations omitted).

In the instant action, there is no dispute that Defendant was not advised of her Miranda warnings before she made statements to Corporal Grier concerning her activities and the location of her firearm.  It is also undisputed that Defendant was not under formal arrest at the time she made the statements.  Indeed, Defendant was not placed under formal arrest until, at the end of their encounter, Corporal Grier gave her a ticket for reckless conduct and told her she was under arrest.  Even then, she was not handcuffed or taken into custody.  Defendant argues, however, that when Corporal Grier arrived on her property, she was in police custody.

Deciding when a suspect was taken into custody for Miranda purposes involves the consideration of several factors, including, among others, the location of the interview, the existence of any physical restraints such as handcuffs or drawn weapons, whether the suspect asked to leave, the officers' demeanor, the degree of pressure applied to the suspect, and whether the officers "brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the

officers could be compelled." United States v. Long, 866 F.2d 402, 405 (11th Cir. 1985).

Here, the police encounter with Defendant Lewis took place on her own property. See T. at 34. She was not physically restrained and no weapons were brandished. She was not told that she was under arrest at the time of the interview, and there is no evidence that she was intimidated, threatened, or coerced. Id. There is no evidence that Lewis asked to leave the encounter, or told Corporal Grier to leave. All of these factors point to a finding that Corporal Grier's interview of Defendant was non-custodial.

Defendant cites United States v. Panak, 552 F.3d 462, 466 (6th Cir. 2009), to support her argument that she was in custody. In Panak, the Sixth Circuit acknowledged that "[e]ven when an interrogation takes place in the familiar surroundings of a home, it still may become custodial without the officer having to place handcuffs on the individual." 462 F.3d at 466 (citing Orozco v. Texas, 394 U.S. 324, 325-26, (1969)). In that case, however, the court found that the in-home interrogation in question had not "cross[ed] the line" into a custodial interrogation. Id. The court emphasized that during the interview, the defendant sat on her living room couch while the two investigators sat in chairs. Id. at 467. The officers did not

limit the defendant's freedom of movement. Id. She was never told that she could not leave or that she was required to answer the investigators' questions. Id. The nature of the interview was "non-threatening and cooperative." Id. This case is analogous. Like Panak, Defendant Lewis was interrogated in her own home, was not threatened or restrained, and never asked to end the encounter. Accordingly, the Court concludes that Defendant Lewis was not in custody at the time she made statements to Corporal Grier about the location of her pistol and other matters. All statements Lewis made during the encounter with Corporal Grier and his partner on January 23, 2008, prior to her formal arrest, are therefore admissible at trial.

Defendant Lewis also argues that the gun seized from her home on January 23, 2008, should be suppressed because it was seized as a result of a warrantless search. The Government concedes that Corporal Grier did not have a search warrant for Defendant's residence, but argues that Defendant gave her valid consent for Grier to enter her house and retrieve the pistol. Corporal Grier testified that when he asked Lewis if she had been shooting a gun, she told him that she had been shooting a pistol and that it was inside her residence. T. at 34. He then asked if he could go inside the house and retrieve the firearm, to which Lewis answered "sure," and took him through the house to her bedroom closet in the back of the house. T. at 35.

The Fourth Amendment protects against unreasonable police searches and seizures. Florida v. Jimeno, 500 U.S. 248, 250 (1991). Warrantless searches are *per se* unreasonable under the Fourth Amendment, subject to only a few specifically established and well-delineated exceptions. Katz v. United States, 389 U.S. 347 (1967). The burden is on the government to prove by a preponderance of the evidence that the search comes within an exception to the warrant requirement. Lego v. Twomey, 404 U.S. 477 (1972).

A consent search is one of the recognized exceptions to the Fourth Amendment warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218 (1973). A search pursuant to consent is not unreasonable so long as the consent is freely and voluntarily given. Florida v. Royer, 460 U.S. 491 (1983); United States v. Tovar-Rico, 61 F.3d 1529 (11th Cir. 1995). The government bears the burden of proving that the consent was not merely a function of acquiescence to a claim of lawful authority, but rather was given freely and voluntarily. Schnekloth, 412 U.S. at 248-49.

To determine whether consent was freely given, the Supreme Court has directed courts to consider the totality of the circumstances. Id. at 227. Among the relevant circumstances to be scrutinized are the defendant's youth, lack of education or low intelligence; the lack of any warnings regarding the accused's constitutional rights,

15

and evidence of duress or coercion, such as deprivation of food or sleep and prolonged detention or questioning.  Id. at 226.

The Court finds that Defendant Lewis' consent to retrieve the pistol from her bedroom was freely given.  The encounter with the two officers was rather brief, and did not involve any threats, deprivation or other indicia of coercion.  Throughout the encounter, Defendant was cooperative with Corporal Grier.  Although Defendant was not told that she had the right to refuse permission to enter her house, she was asked for consent, which implies the ability to refuse; this was not a case in which police gained entry by force or trickery.

Defendant also argues that her consent was not freely and voluntarily given, and also that her statements were not voluntarily made, because she was intoxicated.  At the hearing, Corporal Grier testified that he is an expert in recognizing intoxication.  T. at 38.  He testified that when he encountered Defendant Lewis on January 23, 2008, she was visibly intoxicated, had slurred speech, and was unsteady on her feet.  T. at 66-67.  Defendant told Grier she was depressed and was tired of drinking her problems away.  T. at 69.  Corporal Grier also testified, however, that though she was intoxicated, she was able to understand his questions, was very cognizant, and was "able to keep up very well;" he did not have to repeat his questions.  T. at 76.

16

Corporal Grier's testimony as to Defendant's cognizance is the only evidence of her mental condition.  This evidence, that Defendant was able to converse with police with no apparent difficulty in understanding or making herself understood, leads the Court to find that Defendant's intoxication and depression did not interfere with her ability to give free and voluntary consent for Corporal Grier to enter her house to retrieve the pistol, and did not render her statements to him involuntary.

Accordingly, because Defendant's statements prior to her arrest on January 23, 2008, were not made contrary to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and because evidence seized resulted from a consent search, statements made and evidence seized on January 23, 2008, need not be suppressed.

B.     <u>November 17, 2009</u>

1.     <u>Defendant Gave Valid Consent to Search</u>

Defendant Lewis argues that evidence seized from her residence on November 17, 2009, should be suppressed because the officers did not gain her valid consent to search the residence.  Defendant Robinson joins in this part of the Motion.

17

As noted above, in determining whether consent is freely and voluntarily given, courts look to the totality of the circumstances.  <u>Schnekloth</u>, 412 U.S. at 227.  Here, Corporal Grier testified that after the officers checked Defendant Robinson for weapons outside of the house, Lewis, Robinson, and the officers were "standing around [the] stairs talking about why we were there."  T. at 44.  The conversation was "pleasant."  T. at 45.  Lewis did not appear to be under the influence of drugs or alcohol.  <u>Id.</u>  Lewis was not handcuffed, and was on her own property and surrounded by her family.  T. at 43-45.

During this conversation, after Corporal Grier explained to Defendant Lewis why the officers were there, that they had received a complaint that Defendant Robinson had pointed a gun at an individual and that the individual claimed there was marijuana inside the home, Grier asked Lewis for her consent to search the living room.  T. at 45.  She asked if he had a warrant, and he said he did not, but told her he only wanted to see the living room.  <u>Id.</u>  Defendant Lewis responded, "Okay, fine," and led Grier into the living room.  <u>Id.</u>

The Court finds that Lewis gave her free and voluntary consent for Corporal Grier to enter her house and search her living room.  There is no evidence that Lewis was threatened or coerced into letting Grier into her home, or that she was intimidated

18

by a show of force.  Thus, though he did not have a search warrant at the time he entered Defendant's home, Corporal Grier's presence there was lawful.

Defendant next argues that once Corporal Grier was in her home, his observation of an evidence box of the type used to hold a gun was unlawful because he did not see it until he had moved into the dining room, and he had not received Lewis' consent to enter the dining room.  This argument is contrary to the evidence, as Corporal Grier testified that he saw the evidence box during his search of the living room. T. at 46 ("As soon as I stepped up in there [the living room] you could see directly in, and I noticed a cardboard box marked as evidence that you use for -- well, we use for putting guns into evidence.").  While Corporal Grier was lawfully searching Defendant's living room pursuant to her consent, the evidence box which he presumed contained a gun was in his plain view.

"The 'plain view' doctrine permits a warrantless seizure where (1) an officer [was] lawfully located in the place from which the seized object could be plainly viewed and [had] a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent."  United States v. Smith, 459 F.3d 1276, 1290 (11th Cir.2006).  Corporal Grier did not seize the evidence box upon seeing it from the living room.  Instead, based upon his lawful observation of the box

19

in plain view from the living room, he asked for, and obtained, Defendant's consent to move to the dining room, where he observed the evidence box along with a number of ammunition boxes.  T. at 49.

Regarding Defendant's consent for Lieutenant Hayes and Corporal Grier to move with her to the dining room, the Court finds that the consent was freely and voluntarily given.  Corporal Grier testified that after Lieutenant Hayes arrived, Hayes asked Defendant, "hey, can we go in here and have a seat in your - at your living - or at your dining room table and just kind of, you know, get this thing worked out?" to which Defendant responded, "sure," and led the officers into the dining room where she sat down with Lieutenant Hayes.  T. at 48-49.  No threatening or coercive circumstances arose between the time Defendant gave her consent to a search of her living room and the time she gave consent to go into the dining room.  Just like her consent to enter the house and search the living room in the first instance, Defendant's consent to move to the dining room was valid.

Defendant additionally argues that she did not give valid consent for the law enforcement officers to remain in her house and question her, and did not give consent for Lieutenant Hayes and the agents from ATF and ICE to enter her home.  As found in Finding of Fact 20, however, Hayes asked Defendant's consent for himself, Lewis

20

and Grier to move into the dining room, and she consented.  There is no evidence that Defendant ever told any of the officers not to enter her home, or to leave once they were there.  Moreover, even if Defendant's consent is limited to Grier and Hayes, there is no evidence that other officers seized evidence or made observations different from those of Grier and Hayes that supported the search warrant subsequently issued.

### 2.    The Search Warrant was Valid

After Lieutenant Hayes sat down with Defendant Lewis in the dining room, Corporal Grier left the residence to run a computer search for arrest warrants.  T. at 49.  After the arrest warrants were confirmed, Corporal Grier left the residence to secure a search warrant.  T. at 51.  Defendant Lewis argues that the search warrant secured by Corporal Grier was invalid and the evidence seized in the execution of the warrant should therefore be suppressed.

Defendant first argues that the evidence should be suppressed because the search warrant resulted from an illegal entry into her home.  Corporal Grier's observation of the firearm box and boxes of ammunition in Defendant's dining room was cited in his affidavit in support of the warrant.  See Government's Exhibit 1. Because the Court has found that the officers' search of Defendant Lewis' living room

and their entry into her dining room was consented to by Defendant, the items seized as a result of the search warrant are not "fruit of the poisonous tree," as Defendant argues. See Wong Sun v. United States, 371 U.S. 471, 484-485 (1963) (describing "fruit of the poisonous tree" doctrine, which prohibits the introduction of derivative evidence, both tangible and testimonial, that is acquired as an indirect result of an unlawful search). Corporal Grier's observation of the firearm box and ammunition was made while he was lawfully inside Defendant's home.

Defendant also argues that the search warrant is invalid because Corporal Grier made material misrepresentations and omissions in the affidavit in support of the search warrant. The affidavit explains that Officer Grier was first called to Defendant's residence because of the complaint by Kenneth Stevens. Gov. Ex. 1. It recites Stevens' story that Defendant Robinson pointed a gun at him and that there was marijuana inside the house. Id. The affidavit does not, however, disclose that after arriving at the house, Corporal Grier had searched the living room and found no marijuana. The affidavit also does not attempt to establish Stevens' veracity and basis of knowledge as an informant. Defendant argues that for these reasons, the search warrant was unlawful.

Under Franks v. Delaware, 438 U.S. 154, 171 (1978), a defendant is entitled to a hearing into the sufficiency of a warrant when he makes a preliminary showing of "deliberate falsehood or of reckless disregard for the truth" in the affidavit that was submitted to obtain the warrant.  This preliminary showing requires that the defendant "point out specifically the portion of the warrant affidavit that is claimed to be false," and support this claim with the sworn statement of witnesses, or explain why such statements are unavailable.  Id.  The determination of whether the statements contained in the affidavit are truthful does not require "that every fact recited in the warrant affidavit is necessarily correct," but only "that the information put forth is believed or appropriately accepted by the affiant as true."  Id. at 165.

In this case, Corporal Grier's failure to include in the affidavit that Stevens' information regarding marijuana in the living room of Defendant's house had turned out to be false does not amount to a deliberate falsehood or reckless disregard for the truth.  Grier's inclusion of Stevens' information serves to explain the officers' arrival at the house in the first place, and their entry into the house to search for the alleged marijuana.  It is part of the narrative leading up to the basis for probable cause, which is Grier's statement that, "while at the location, I saw in plain view several boxes of handgun ammunition.  I also saw a cardboard box used to store firearms." Gov. Ex. 1.

The affidavit does not, as Defendant argues, rely on the information from Stevens to establish probable cause to search her home, and thus, the fact that the original consent search did not find marijuana is not relevant and is not a material omission.

Morever, Grier's omission of the result of the consent search is not material because probable cause for the warrant exists without that information.  As noted above, the affidavit stated that Grier had seen, in plain view, a box that likely contained a firearm and a number of boxes of ammunition.  Additionally, because he had run the computer search for arrest warrants, he knew that Defendant Lewis was an illegal alien and that it was illegal for her to possess any firearm.  Gov. Ex. 1. Thus, Grier's viewing of the box and ammunition while lawfully in Defendant's house created a sufficient probability of finding evidence of illegal activity in the house to justify issuance of the search warrant.  See United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) ("Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location.").

Because the search warrant was supported by probable cause, which was based on information gathered legally, the warrant was valid and items seized pursuant to the warrant are not subject to suppression.

3.      Statements Made by Defendant are Admissible

Defendant Lewis argues that any statements she made on November 17, 2009, should be suppressed because she was in custody at the time she made them and was not given a Miranda warning.  As discussed above, deciding when a suspect was taken into custody for Miranda purposes involves the consideration of several factors, including, among others, the location of the interview, the existence of any physical restraints such as handcuffs or drawn weapons, whether the suspect asked to leave, the officers' demeanor, the degree of pressure applied to the suspect, and whether the officers "brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled."  United States v. Long, 866 F.2d 402, 405 (11th Cir. 1985).

As with her January 23, 2008, encounter with law enforcement officers, which the Court has found to be non-custodial, the November 17, 2009, police encounter took place on her own property.  Until she was told by Corporal Grier, "you can't go anywhere," T. at 49, Defendant was not told the she could not leave.  Until she was handcuffed after her arrest warrants were confirmed, T. at 50, she was not physically restrained and no weapons were brandished.  She was not told that she was under arrest before being interrogated by Lieutenant Hayes in the dining room, or before

25

answering any other questions.  There is no evidence that she was intimidated, threatened, or coerced.  Id.  There is no evidence that Lewis asked to leave the encounter, or told the officers to leave.  Thus, like the January 23, 2008, encounter, the majority of the November 17, 2009, encounter was non-custodial.

After Defendant Lewis was told, "you can't go anywhere," T. at 49, and later handcuffed, she was "in custody" for the purposes of Miranda.  Thus, any statements she made in response to police interrogation after that time should be suppressed.

Defendant made one statement after her arrest that is at issue.  Right as the encounter was "wrapping up," Lieutenant Hayes made an "offhand" comment to Agent Arrugueta that ammunition for a .45 caliber gun had been found, but no .45 caliber gun.  T. at 25.  Defendant Lewis "stated that her dad had that gun" and had taken it to be repaired.  Id.  Since Defendant was in custody at the time she said this, the question of whether the statement should be suppressed hinges on whether it was made in response to police interrogation.

In Rhode Island v. Innis, 446 U.S. 291 (1980), the Supreme Court established that "[t]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally

attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. at 301. The inquiry into what the police "should know" to be likely to elicit an incriminating response focuses not on the intent of the officers but rather the "perceptions of the suspect." Id. at 301.

Here, Hayes' comment to Arrugueta served the purpose of informing Arrugueta that the .45 caliber gun they had expected to find was missing. There is no indication that the comment was made in an attempt to illicit an incriminating response from Defendant Lewis, and it is unreasonable to assume that Lewis perceived the comment as requiring a response from her. Rather, Lewis offered voluntarily and spontaneously that her father had the gun, and Lieutenant Hayes' comment did not constitute "interrogation" under Miranda or Innis.

The Eleventh Circuit has held that "[v]oluntary and spontaneous comments by an accused, even after Miranda rights are asserted, are admissible evidence if the comments were not made in response to government questioning." Cannady v. Duggar, 931 F.2d 752, 754 (11th Cir. 1991). Thus, as Defendant's statement about the location of the gun was not made in response to "interrogation," but was a spontaneous utterance, the fact that it was made without Defendant having first been

27

given <u>Miranda</u> warnings is irrelevant.  Under <u>Cannady</u>, this statement may be admitted

into evidence as a voluntary statement of the accused.

## ORDER AND RECOMMENDATION

For all the above reasons, the undersigned **RECOMMENDS** that Defendant's

Motion [23][26] be **DENIED**.

Additionally, it is **ORDERED** that Defendant Robinson's motion to adopt [39]

is **GRANTED**.

**IT IS SO ORDERED AND RECOMMENDED** this 16th day of June, 2010.

_____

C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE